EXHIBIT A

# MARKETING AGENCY AGREEMENT

This non-exclusive marketing agency agreement ("Agreement") is made and entered into on this __8th__ date of __November__, 2016, by and between Arris Holdings LLC ("Arris"), a Delaware Limited Liability Company, and TranzVia ___ ("TranzVia"), a __LLC_____, under which Arris will provide to TranzVia certain "opt-in" lead data and related services, and TranzVia will pay to Arris an agreed upon price per lead. This Agreement was contemplated by, and shall now supersede entirely, the parties' former letter of intent entered into on or about November ___, 2016.

TERMS

The parties agree to the following terms:

1. **Sales Leads.** While this Agreement is in effect, Arris shall provide to TranzVia one-hundred and seventy-five to three-hundred (175-490) Sales Leads per day. Arris shall provide at least 90% of the daily leads by 4 p.m. Central time. This lead minimum and range may be amended by the parties from time to time by mutual agreement in writing (email is sufficient). TranzVia shall be required to accept Arris's maximum Sales Lead output capacity up to 490/daily (or the then-current agreed upon maximum). All Sales Leads will be delivered within sixty (60) minutes of opt-in, notwithstanding rollovers as dictated by vertical market owner contact cycles. For purposes of this Agreement, a "Sales Lead" shall be defined as at least the name and telephone number of a business prospect who has, according to Arris's audited response data, opted to receive information about merchant processing services of the type offered by TranzVia. All Sales Leads are delivered "AS IS WHERE IS." The Sales Leads are not guaranteed to be free from invalid or incorrect information as the parties acknowledge that the rates for this lead category already account for the potential that some invalid or faulty leads may be erroneously provided to TranzVia by Arris. All lead delivery discrepancies must be brought to Arris' attention within 24 hours to roseventures@icloud.com, or are otherwise waived. Arris invoices due and payable upon receipt by TranzVia, via wire transfer, in US Dollars. Regarding the raw lead data, Arris shall update such data quarterly and shall provide raw data with multiple "selects" to TranzVia. Opt-in Sales Leads will be uploaded into TranzVia's C.R.M. by Arris employees. The price per Sales Lead shall be according to the following tiered pricing, which the parties may modify later in writing if they choose:

| Daily Leads | Tiered Pricing |
|---|---|
| 175 | $ 33.50 |
| 220 | $ 33.50 |
| 265 | $ 33.50 |
| 310 | $ 30.15 |
| 355 | $ 30.15 |
| 400 | $ 27.15 |
| 445 | $ 27.15 |
| 490 | $ 27.15 |

2. **Opt-Outs.** TranzVia shall report do-not-call ("DNC") requests to Arris in writing within 24 hours of receipt.

3. **Residual Revenue Sharing.** There shall be no residual revenue sharing, unless otherwise agreed to by the parties in writing at a later time.



4. Payment for Individual Leads. For purposes of this provision, the term "lead" shall include both Inside Sales Leads and Outside Sales Leads. Every fifteen (15) calendar days ("Invoice Period"), Arris shall be pre-paid for the subsequent 15 days of leads forecasted. Arris will estimate lead output volume for the 15 day period based upon Transavia's request for leads considering the minimums. Any disparity between the actual lead output and the previous estimate shall be accounted for, and any applicable credit given, in the subsequent invoice. Upon its receipt of any invoice from Arris, TranzVia shall promptly remit payment to Arris based on Arris's estimate and invoice. TranzVia shall provide its payments to Arris no later than 24 hours upon receipt of invoice. Arris may add a five percent (5%) interest charge on any late payments.

5. Data Suppression Service. On a quarterly basis, TranzVia shall provide to Arris a data file in either FTP-site or CD-file format, containing its entire master lead database. Upon receipt of TranzVia's master lead database, Arris shall promptly compare the data file to its own national lead database and return a data analysis ("Suppression Report") containing all discovered unique leads which did not previously exist in TranzVia's database. TranzVia shall then pay to Arris, within thirty (30) days of receiving the Suppression Report, the sum of four-tenths of one cent ($0.004) per discovered unique lead in the Suppression Report. Arris may add a five percent (5%) interest charge on any late payment. TranzVia shall be entitled to a credit on the following quarter's data suppression fee for any non-usable data discovered following the previous quarter's Suppression Report.

6. Term. This Agreement shall commence on the date first set forth above ("Effective Date"), and shall expire, unless earlier terminated as provided herein, on the date that is one (1) year after the Effective Date. This Agreement will then automatically renew for successive one-month renewal terms until either party provides thirty (30) day's prior written notice to the other of its intent not to renew.

7. Termination. This Agreement may not be terminated prior to the end of the initial term except in the event of a material breach by a party who fails to cure said material breach within ninety (90) days following receipt of written notice of the material breach from the non-breaching party. The Agreement will terminate ninety (90) days after either party has received written notice from the other of that parties' material breach if said breach remains uncured at that time.

8. Modifications. Modifications to this Agreement may only be made by the express, mutual written Agreement of both parties.

9. Non-Dialing Dates. Notwithstanding anything contained herein to the contrary, Arris shall not be required to provide any leads on the following days and dates: (a) all Fridays; (b) all official state and federal holidays; (c) November 21-23, 2012; (d) December 24, 2012 – January 1, 2013; (e) November 27-29, 2013; (f) December 23, 2013 – January 1, 2014. At Arris's option, Arris may elect to transmit messages and provide leads to TranzVia on these days, even though Arris is not obligated to do so.

10. Exclusivity. The Agreement shall be non-exclusive with respect to each party. However, any lead sold to TransVia pursuant to this Agreement shall be considered an exclusive lead and shall not be sold by Arris to any other party.

11. Recordings. Arris shall have sole and complete discretion as to the messages it transmits in order to obtain potential lead data, as well as to the process Arris uses to audit the initial response data before providing leads to TranzVia.

12. Consumer Complaints. Upon TranzVia receipt of any complaint from any potential TranzVia customer whose contact information was provided to TranzVia by Arris, TranzVia shall immediately notify Arris of



the complaint and first allow Arris the opportunity to resolve the complaint before TranzVia takes any additional action to resolve the matter. TranzVia shall immediately notify Arris if TranzVia receives any lawsuit or government inquiry or notice in any way related to the leads which Arris provides to TranzVia.

13. Independent Contractor. The business relationship between Arris and TranzVia shall be that of independent contractors only. In rendering any service, payment, or performance to the other party under this Agreement, a party shall act as an independent contractor only and not as an employee or agent of the other. As independent contractors, the parties shall have no authority, express or implied, to commit, bind, or obligate the other to any third parties. Nothing contained in this Agreement may be construed to create a partnership or joint venture by or between TranzVia and Arris.

14. Compliance with Law. Each party agrees to fully comply with all applicable laws and regulations that applies to its own operations. In particular, Arris will act in good faith to facilitate campaign compliance with FCC, FTC and state regulations until the point of lead delivery, at which time TranzVia shall become solely responsible and liable for the use of such leads.

15. Indemnity. Notwithstanding anything contained herein to the contrary, each party agrees to indemnify and hold harmless the other, together with its shareholders, members, partners, directors, officers, employees and agents, from and against any and all losses, liabilities, claims, costs (including costs of investigation and defense), damages and expenses (including attorneys fees) which the indemnified party may sustain resulting from, arising out of, relating to or caused by any breach by the other party of any covenant, representation, or warranty contained herein. The remedies provided in this section are not exclusive of and do not limit any other remedies that may be available to either party.

16. Intellectual Property. Arris Intellectual Property shall include all rights, title and interest (including all copyrights, moral rights, trademarks, trade names, patents and other intellectual property rights) in and to the service (including without limitation all of the Arris software, documentation, updates, improvements, enhancements, derivative works and other such items (but excluding consumer data), and in the software, hardware, other materials, processes, know-how and the like utilized by or created by Arris in the provision of the service hereunder. Arris shall retain exclusive ownership and rights in all Arris Intellectual Property. TransVia will engage in the highest degree of care relating to any Arris intellectual Property it comes into possession of.

17. Special Conveyance of Intellectual Property. While this agreement is in force, Tranzvia will have exclusive use of the Intellectual Property as called out in section 16. This use is specifically for generating opportunities to do business in the credit card processing industry. Arris will remove availability of the lead program from the credit card processing and financial services industry.

18. Currency. All amounts specified in this Agreement refer to standard U.S. currency.

19. Representations and Warranties. Arris represents and warrants to TranzVia that: (i) it is a duly formed business entity of the type listed in the first paragraph of this Agreement, validly existing and in good standing under the laws of the state of its formation as listed in the first paragraph of this Agreement; (ii) it has the lawful right, power, authority and capacity to enter into this Agreement; (iii) the person signing this Agreement is authorized to do so; and (iv) neither the execution nor the performance of this Agreement shall constitute a violation of or interfere with TranzVia's obligations to any third party. TranzVia represents and warrants to Arris that: (i) it is a duly formed business entity of the type listed in the first paragraph of this Agreement, validly existing and in good standing under the laws of the state of its formation as listed in the first paragraph of this Agreement; (ii) it has the lawful right, power, authority

and capacity to enter into this Agreement; (iii) the person signing this Agreement is authorized to do so; and (iv) neither the execution nor the performance of this Agreement shall constitute a violation of or interfere with TranzVia's obligations to any third party. Neither party makes any representation or warranty except those expressly set forth in this Agreement. Each party disclaims all other warranties and conditions, express, implied or statutory, including without limitation the implied warranties of title, non-infringement, merchantability, and fitness for a particular purpose.

20. Assignment. Either party may assign or transfer its rights and/or obligations under this Agreement to third parties upon thirty (30) days' written notice to the other of its intent to do so. This Agreement shall be binding on any such third parties. For purposes of this paragraph, the term "assign or transfer" shall include, without limitation, any merger, sale of stock or other change in control of TranzVia that results in a change in equity ownership of the party of more than fifty percent (50%).

21. Force Majeure. Neither party shall be liable for failures or delays in delivery or in performance due to causes beyond its reasonable control, including but not limited to acts of God or civil or military authority, epidemics, war, riot, delays in transportation or shortages of transportation vehicles, strikes or labor stoppages. In the event of any such delay or failure, the party affected shall promptly notify the other party in writing and use all commercially reasonable efforts to overcome the event or circumstance causing the delay or failure as soon as practicable.

22. Waivers. No failure to exercise, delay in exercising, or single or partial exercise of any right, power, or remedy by either party shall constitute a waiver thereof. No provision of this Agreement shall be deemed waived unless such waiver shall be in writing signed by both parties. No waiver by either party of any of its rights or remedies on any particular occasion shall operate as a waiver of any other of its rights or remedies or any of its rights or remedies on a future occasion.

23. Entire Agreement. This Agreement, constitutes the entire Agreement of the parties with respect to the subject matter hereof and supersedes all other prior Agreements, written or oral, between the parties.

24. Governing Law; Jurisdiction; Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of Utah, where each party conducts some business, without regard to conflicts-of-laws principles that would require the application of any other jurisdiction's law. Each party hereto irrevocably submits to the jurisdiction of each State court located in the State of Utah and waives any objection it may now or hereafter have to venue or to convenience of forum. Any lawsuit arising out of this Agreement, whether in tort, contract, or otherwise, shall be brought and litigated only in the state courts of the State of Utah, unless both parties agree otherwise in writing. Before commencing any lawsuit against the other, the parties agree to first negotiate in good faith and then to use commercial mediation to attempt to resolve any such dispute. While this Agreement is in effect and for a period of at least one (1) year after termination, the parties shall act in good faith to keep any prior or ongoing dispute between the them strictly confidential, to the extent allowed by law.

25. Binding. This Agreement shall be binding on the parties and their respective heirs, successors, assigns, and transferees.

26. Counterparts. This Agreement may be signed in counterparts and by signature sent by facsimile, each of which shall be deemed to be an original, and all of which together shall constitute one and the same Agreement.

27. Severability.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

28. Cooperation.  Each Party agrees to execute and deliver such further documents and to cooperate as may be necessary to implement and give effect to the provisions contained herein.

29. Paragraph Headings.  The paragraph headings in this Agreement are for convenience and informational purposes only and in no way alter or restrict the content of the particular sections they attempt to describe.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

ARRIS HOLDINGS, LLC

By: _____ (authorized signature)

Gordon Rose, CEO

1326 N. Central Avenue, Unit 408

Phoenix, Arizona 85028

roseventures@icloud.com


TranzVia LLC

By: _____ (authorized signature)

Paul Nee, CEO

6509 Windcrest Drive, Suite 160

Plano, Texas 75024